NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210533-U

NOS. 4-21-0533, 4-21-0534, 4-21-0535 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.A., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|       Petitioner-Appellee, | ) | Coles County |
|       v. (4-21-0533) | ) | No. 18JA31 |
| Mary G., | ) | |
|       Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* A.A., a Minor | ) | No. 18JA32 |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v. (4-21-0534) | ) | |
| Mary G., | ) | |
|       Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* K.G., a Minor | ) | No. 19JA11 |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v. (4-21-0535) | ) | Honorable |
| Mary G., | ) | Jonathan T. Braden, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding respondent unfit and terminating her parental rights to her three children.

¶ 2          Respondent, Mary G., appeals the trial court's termination of her parental rights to

her three children. She argues the court's fitness determination was against the manifest weight of

the evidence. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4              Respondent is the mother of three children, A.A. (born April 28, 2014), D.A. (born June 24, 2016), and K.G. (born February 26, 2019). In April 2018, prior to K.G.'s birth, the Illinois Department of Children and Family Services (DCFS) received a report that A.A. and D.A. were found inside a bedroom with the door secured shut by "a ratchet type of strap." Respondent had left the home to attend a court appearance, which resulted in her being sentenced to 30 days in jail. Her paramour, Trevor G., was in the home, but asleep when the children were found.

¶ 5              In May 2018, the State filed petitions for adjudication of wardship, alleging A.A. and D.A. were neglected minors. It asserted that due to respondent's incarceration and her abuse of drugs, A.A. and D.A. were not receiving the proper or necessary support or other remedial care necessary for their well-being and their environment was injurious to their welfare. In June 2018, respondent admitted the State's allegations, and the trial court entered an adjudicatory order finding the minors neglected based on respondent's incarceration and her "admitted abuse of marijuana." On July 19, 2018, a second adjudicatory order was entered, finding the minors neglected based only on respondent's abuse of drugs. The same date, the court conducted a hearing in which respondent asserted she had "no objection to the dispositional recommendations." The court entered a dispositional order making A.A. and D.A. wards of the court and placing their custody and guardianship with DCFS.

¶ 6              In February 2019, K.G. was born to respondent and Trevor. In March 2019, the State filed a petition alleging he was also a neglected minor. In April 2019, the trial court entered an adjudicatory order finding K.G. was neglected based on (1) respondent not having corrected the conditions that brought A.A. and D.A. into DCFS's care and (2) respondent and Trevor being

unable to provide adequate housing for K.G. In October 2019, the court entered a dispositional order making K.G. a ward of the court and placing his custody and guardianship with DCFS.

¶ 7        In April 2020 and March 2021, the State filed motions to terminate respondent's parental rights to all three minors. It alleged respondent was unfit for (1) failing to make reasonable efforts to correct the conditions that were the basis of the minors' removal from her care during two consecutive nine-month periods following adjudication—July 28, 2018, to April 28, 2019, and April 28, 2019, to January 28, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)); (2) failing to make reasonable progress toward the minors' return to her care within the same two consecutive nine-month periods following adjudication (*id.* § 1(D)(m)(ii)); and (3) demonstrating an inability to discharge parental responsibilities due to mental impairment, mental illness, mental retardation, or developmental disability (*id.* § 1(D)(p)). As to K.G., the State additionally alleged respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to his welfare (*id.* § 1(D)(b)). Finally, the State alleged termination of respondent's parental rights was in each minor's best interests. (The record shows that, during termination proceedings, the State also successfully sought to terminate the parental rights of the minors' fathers. However, because those individuals are not parties to this appeal, we set forth the relevant facts only as they relate to respondent and the children.)

¶ 8        In May and June 2021, the trial court conducted hearings on the issue of respondent's fitness. Morgan Kent testified she worked for DCFS as a child welfare advanced specialist and oversaw the case involving the minors and respondent. During the early stages of the case, a service plan was drafted, and the following services were recommended for respondent: "mental health services, substance use services, domestic violence services, family therapy, safe and stable housing, and parenting." Kent stated she met with respondent, provided her with a copy

of the service plan, and explained what was expected of her based on service plan goals. After K.G. was removed from respondent's care in March 2019, respondent's services were primarily the same. According to Kent, during the life of the case, respondent completed a substance abuse evaluation, which resulted in no treatment recommendations, and, at some point, had safe and stable housing. However, respondent otherwise failed to complete individual and family therapy, failed to demonstrate the ability to appropriately parent, and had difficulty maintaining psychiatric care.

¶ 9    Kent testified that although respondent was involved in individual therapy, she was inconsistent and "did not make progress due to the fact that she continued to minimize and justify the reason the children came into care ***." She stated respondent began therapy in June 2018 but was discharged in August 2018 due to lack of attendance. At the end of October 2018, respondent reengaged in therapy but did not make progress toward her goals. Later, a "clinical conflict" arose that resulted in respondent having to obtain a different therapist. Kent stated she provided respondent with a referral to continue individual therapy but respondent did not reengage in therapy "by the end of the nine-month time period." Additionally, Kent testified that family therapy would occur when recommended by a parent's individual therapist. In respondent's case, family therapy did not occur due to respondent's lack of engagement in individual therapy.

¶ 10    Kent testified respondent also failed to complete parenting services during the July 2018 to April 2019 time period. Specifically, although respondent engaged in parenting education services, "she was not able to display the knowledge that she learned ***." Kent noted that, during visits between respondent and her children, concerns persisted regarding respondent over-feeding the children, as well as her ability to supervise the children and understand child development milestones. Kent testified that respondent had visits with her children twice a week for two hours.

Respondent regularly attended visitations, and during the last visit Kent observed in March 2020, respondent had "a positive interaction with her children."

¶ 11　　　According to Kent, respondent also failed to complete domestic violence counseling services during the relevant nine-month time frames. She stated domestic violence counseling was originally going to be incorporated into respondent's individual counseling; however, because it was never addressed, a separate domestic violence education course was recommended. Kent testified respondent was referred for that course in August 2019, but she did not engage in the service until November 2019 and did not complete the six-week course by the end of January 2020.

¶ 12　　　Kent testified the allegations that brought the children into care were "tying and confinement," or, more specifically, that they had been "ratchet strapped in a bedroom." There were also concerns about a lack of proper supervision in the home. Given these circumstances, her experience, and her observations of the case, Kent opined that mental health and parenting services were the most important services for respondent to complete. Kent stated that from July 2018 to April 2019, respondent did not successfully complete psychiatric services. In August 2019, respondent attended a psychiatric appointment but, thereafter, missed two appointments and was "discharged" from psychiatric services. Kent stated respondent did not reengage in psychiatric services during the remainder of that second nine-month period. After both relevant nine-month periods, respondent saw "a psychiatrist who said that her primary care doctor could follow her medication." Kent testified that two or three months before the fitness hearings, respondent decided to stop taking her medication against the advice of her doctor because it "was making her feel ill." It was later determined that respondent was not feeling well due to carbon monoxide poisoning.

¶ 13 Additionally, Kent testified that from August 2018 to March 2019, respondent lived in a garage with no access to water. In March 2019, respondent and Trevor moved to an apartment. Later, they moved from the apartment to another residence, where there were concerns about space and structural issues. Respondent and Trevor made "some corrections" to that residence, and the only remaining concern was that the children's bedroom went "directly to the garage."

¶ 14 On cross-examination by respondent's counsel, Kent testified that respondent completed the parenting curriculum that was recommended but failed to display or demonstrate the knowledge she should have gained from the curriculum during visitations. Specifically, Kent stated respondent struggled to provide adequate supervision during visits and struggled with over-feeding her children. According to Kent, the most significant obstacles to returning the children to respondent's care were respondent's inability to consistently engage in mental health services and provide adequate and safe supervision of her children. Kent denied that the services in place for respondent were influenced by a parenting capacity assessment respondent underwent in October 2019. Additionally, she agreed respondent was engaged in individual therapy "for part of" the April 2019 to January 2020, nine-month period, and respondent ultimately completed domestic violence services after the relevant nine-month time frames.

¶ 15 Tiffany Ruff testified she worked as a family service specialist and provided coaching to parents on ways to improve their parenting. From May 2018 to March 2020, she worked with respondent and supervised visits between respondent and her children. Ruff described several instances when concerns arose during respondent's visits with the minors which caused Ruff to intervene. She noted an incident in April 2019, when respondent walked ahead of D.A. up a flight of stairs and D.A. slipped a couple of times and had to be caught by Ruff. During a visit in May 2019, D.A. ran into the road and had to be corrected by Ruff. Also in May 2019, A.A.

- 6 -

removed the screen from a second story window and leaned outside. Ruff let respondent know what A.A. was doing, but respondent "did not see a problem with it." In October 2019, Ruff spoke with respondent and Trevor about the need to interact with the children during visits and not allow them to only watch television. According to Ruff, respondent and Trevor were not "receptive to that concept." Finally, Ruff noted issues also arose with respondent over-feeding the children, even after the issue had been discussed with her. Ruff recalled a visit when D.A. complained that her stomach hurt and vomited after eating too much.

¶ 16    Ruff further testified that part of her job involved looking for evidence that what a parent was being taught in parenting classes was actually being utilized by the parent when interacting with his or her children. During respondent's visits with the minors, there were times respondent did not utilize the things she was being taught. Ruff maintained that each incident of concern she described occurred in 2019. Additionally, she stated that although respondent's parenting skills improved, respondent did not use all of the suggestions given to her.

¶ 17    As part of her case, respondent presented testimony from Dr. Derek Phillips, a clinical neuropsychologist. Dr. Phillips performed a parenting capacity assessment of respondent, and his written report, dated May 6, 2021, was admitted into evidence. The record reflects that in preparing his assessment, Dr. Phillips met with respondent for approximately three hours in December 2020, administered various tests to respondent, and reviewed records provided by DCFS. His report shows he diagnosed respondent with posttraumatic-stress disorder (PTSD); conversion disorder, with seizures; depression and anxiety; a learning disorder; and cannabis use disorder, which was in remission. According to the report, Dr. Phillips opined respondent had "the capacity to parent safely and responsibly." He stated that, although respondent had "some mental health disorder diagnoses," those disorders did "not summarily preclude her from being a safe and

responsible parent."

¶ 18            In his report, Dr. Phillips noted he reviewed a prior parenting capacity assessment performed on respondent in October 2019 by Dr. Judy Osgood. He indicated disagreement with Dr. Osgood regarding the severity of respondent's mental health issues. He also noted concerns Dr. Osgood raised regarding respondent's substance abuse, homelessness, and unemployment had been addressed by respondent. Specifically, he found respondent was no longer actively using substances, she had stable housing, and she was employed. He further stated as follows:

>            "[I]t is my opinion that [respondent] is able to understand basic parenting skills. However, due to her reported history of learning disorders, she may require more intensive and directive education to understand even seemingly simple concepts. She answered psychological test questions relevantly and did not appear to be attempting to present herself in an overly positive or overly negative light. Test results also did not indicate a high child abuse potential or intractable mental health disorders that would prevent her from being a responsive and overall good parent.

>            Further, [respondent] appears to have a much more stable life and environment for raising children than she did in the past, as she and [Trevor] have purchased a home *** and a vehicle, and she now works full-time."

¶ 19            At the fitness hearing, Dr. Phillips testified consistently with his report. He opined respondent's mental health had improved since the children were removed from her care in 2018, stating she previously exhibited "a lot more severe symptomatology." He believed the social and mental health services respondent had received since 2018 had helped her. Dr. Phillips also testified the children could be transitioned to respondent's care without significant risk to the children and that supervised visits were unnecessary. He believed respondent was capable of

continuing to learn to be a better parent. Further, he testified he was aware that respondent had been prescribed Zoloft by her primary care physician. He believed that medication was appropriate for respondent, and he identified no other reason why respondent would need to see a psychiatrist.

¶ 20 On cross-examination, Dr. Phillips acknowledged that when evaluating respondent, he did not observe her with her children. Additionally, although he testified it was safe for the children to return to respondent's care, he agreed that it was also his opinion that respondent required more structured treatment in the form of parenting education. On examination by the trial court, Dr. Phillips clarified that when he testified it was safe for the minors to return home to respondent, he would include the qualification that there would still be intervention from outside agencies assisting her and respondent would still have "the other supports," including "intensive education" and "someone observing and pointing out things in real time."

¶ 21 At the fitness hearing, respondent also testified on her own behalf. She recalled when A.A. and D.A. were removed from her care in April 2018, and maintained that, at that time, she was "not mentally stable." Respondent explained she broke a glass cup and did not have time to clean it up. As a result, she "ended up ratchet strapping [the minors'] doors shut so they wouldn't step on glass." Respondent acknowledged she left the home to attend a court appearance and stated she was scared because she knew she was going to have to go to jail. She agreed that confining the minors in their bedroom was not a good choice. She stated she "wasn't even thinking" and she felt "terrible" about what happened. Respondent maintained her mental health and decision-making abilities had improved since that time. If the minors were returned to her care and she had somewhere to go, she would find a babysitter or take the minors with her.

¶ 22 Respondent testified that as part of her service plan, she was required to attend parenting classes and obtain employment and housing. She stated she was not told that there was

a certain number of parenting classes she had to attend and that parenting services was something that occurred during visits with the minors. Respondent stated she was currently having video-chat visits with the minors twice a month. She had not missed any visits, and it had been over a year since she last saw the minors in person. Additionally, at the time of the hearing, respondent and Trevor were living in a one-bedroom house that had been approved by DCFS. She stated she and Trevor slept in the living room and had turned the bedroom "into the kids' room." Respondent was also employed at a McDonald's restaurant and had a vehicle. She testified she had someone available to watch the children while she worked. According to respondent, that person lived across the street from her job and had "been approved for visits and stuff like that" by DCFS.

¶ 23    Respondent testified her service plan also required her to obtain a substance abuse evaluation. She testified she complied with that requirement and no further substance abuse services were recommended. Respondent denied having any problem with alcohol or drugs.

¶ 24    Respondent acknowledged that her mental health was also an important topic of her service plan. She agreed that, throughout the case, her caseworker repeatedly asked her to see a psychiatrist. Respondent testified she tried to comply with that request and, ultimately, was prescribed medication for her mental health by her primary care provider. She believed that medication was appropriate for her and helpful. Respondent stated she also completed a domestic violence course and was seeing a counselor approximately three times a month. She estimated she had been seeing her counselor for a year or longer and stated she had previously seen other counselors during the course of the case. Respondent acknowledged that there had been some "start-ups and some stops" with respect to her counseling. However, she maintained she was never opposed to counseling and, instead, had "a hard time trying to find a counselor."

¶ 25    On cross-examination, respondent acknowledged that family therapy was

recommended as part of her service plan. She testified she was almost ready to engage in couple's counseling with Trevor but whether that was appropriate was up to her counselor. Respondent further acknowledged that she struggled to complete or engage in services during the July 2018 to April 2019, nine-month time period. Although service plan requirements were explained to her, she experienced a difficult pregnancy with K.G., which kept her from engaging in services from August 2018 to March 2019. Respondent agreed she was told that she needed a substance abuse evaluation in August 2018, but she did not get one until March 2019. Additionally, in August 2018, she was discharged from counseling for poor attendance.

¶ 26　　　　Respondent further agreed that during the incident when A.A. and D.A. were confined to their room with a ratchet strap on the door, the windows to the room were covered with tinfoil and a "child's potty" had been placed in the room. She acknowledged that previously, she had "some trouble being honest about the circumstances that brought [the minors] into care ***." Respondent also testified that she had problems with substance abuse in the past, specifically, marijuana. She testified that from August 2018 through February 2019, she and Trevor lived in a garage that had no heat or running water. After living in the garage, she moved in with a friend and then had an apartment. Respondent asserted she had lived in her current house for almost seven months.

¶ 27　　　　As part of her case, respondent additionally asked the trial court to take judicial notice of three DCFS reports filed in the minors' cases in May 2019, July 2019, and January 2020. The court ruled it would consider the reports with the exception of any hearsay material. The record reflects the May 2019 report was filed prior to the dispositional hearing in K.G.'s case. According to the report, respondent was engaged in individual therapy and received positive reports from her therapist; completed a neuropsychological assessment in April 2019, resulting in a

- 11 -

recommendation that she "engage in occupational therapy or neuropsych rehabilitation"; engaged in parenting services; and completed a substance abuse assessment. However, she otherwise struggled to maintain stable housing and employment and failed to initiate psychiatric services. Additionally, DCFS noted concerns regarding respondent's parenting capacity. Ultimately, the report recommended that the trial court find respondent unable to care for, protect, train, educate, supervise, or discipline K.G. and that placement with respondent was not in K.G.'s best interests.

¶ 28    The July 2019 DCFS report was filed in connection with a permanency hearing in A.A. and D.A.'s cases. With respect to respondent, the report contained similar information to the May 2019 report. Additionally, it included DCFS's finding that respondent had made reasonable efforts but not reasonable progress toward the return of the minors to her care.

¶ 29    The January 2020 DCFS report was filed in connection with a permanency hearing for all three minors. According to that report, respondent completed a recommended parenting capacity assessment in October 2019, maintained stable housing since March 2019, and maintained stable employment since October 2019. However, concerns regarding respondent's ability to supervise all three children during visits persisted. Additionally, respondent failed to reengage in individual therapy after a "clinical conflict" arose with her therapist in October 2019. She was also reported as noncompliant with psychiatric treatment because she stopped taking her prescribed medication in August 2019 and failed to attend scheduled psychiatric appointments in September 2019 without rescheduling. Respondent further completed only one of six required domestic violence education classes. DCFS recommended respondent be determined not to have made either reasonable efforts or substantial progress toward the minors' return to her care.

¶ 30    In rebuttal, the State presented testimony from Dr. Osgood, the licensed clinical psychologist who performed the parenting capacity assessment of respondent in October 2019. Dr.

- 12 -

Osgood prepared a report regarding her assessment that was also admitted into evidence. The reports show she interviewed respondent, observed respondent with her children, and reviewed various reports and records. Dr. Osgood found respondent did "not present the ability to properly supervise and care for her children without supervision." She identified respondent's "risk factors" as having a history of severe mental health problems, substance abuse problems, domestic violence, homelessness, and unemployment. Dr. Osgood recommended (1) all contact between respondent and her children be supervised, (2) random drug screens, (3) continued psychiatric treatment and medication management, and (4) ongoing participation in community-based resources.

¶ 31 At the fitness hearing, Dr. Osgood testified she reviewed a psychological evaluation performed on respondent that revealed a history of depression, anxiety, PTSD, and a learning disability. She stated her recommendations were based on respondent's extensive mental health history as well as her history of substance abuse. Dr. Osgood further testified that she would agree that respondent had the ability to understand basic parenting skills; however, she did not believe that respondent had the ability to consistently apply those skills.

¶ 32 Also in rebuttal, the State recalled Kent as a witness. Kent testified service plans were reviewed and updated every six months after a child came into care to review a parent's progress and discuss barriers to the completion of services. Kent identified service plans created in the underlying cases in July 2018, November 2018, May 2019, and November 2019. She testified each service plan was discussed and reviewed with respondent. All four service plans were then admitted into evidence.

¶ 33 At the conclusion of the fitness hearing, the trial court took the matter under advisement. In July 2021, the court conducted a hearing and set forth its fitness ruling. With respect

to A.A. and D.A.'s cases, the court found respondent had failed to make reasonable efforts or progress during both alleged nine-month time periods, extending from July 2018 to April 2019, and April 2019 to January 2020. As to K.G., who was born in February 2019, the court found respondent failed to make reasonable efforts or progress during only the latter nine-month period, extending from April 2019 to January 2020.

¶ 34 In setting forth its decision, the trial court stated it found the circumstances that initially led to removal of the children from respondent's care were "egregious," noting as follows:

> "[A.A. and D.A.] were ratchet strapped into a bedroom ***. The windows of the bedroom were covered in tinfoil to prevent anyone from seeing into the room. A child's toilet was placed in the room, and [respondent] left the home to go to court with the expectation that she was going to be sentenced to jail. The Court believes the intent of those actions is obvious and that there was a level of planning into these circumstances."

The court determined respondent had not "demonstrated an acceptance of [her] actions," noting her insistence that she confined the children for their own protection.

¶ 35 The trial court further noted it heard "substantial testimony" regarding the services respondent was ordered to comply with and stated it found those services were appropriate. The court stated respondent made "some reasonable efforts related to [her] services" during the course of the case, noting her housing status had improved, she was employed, she engaged in parenting classes, and attended visitations. Ultimately, however, it found that safety issues in the case persisted and it "accept[ed] the evidence presented that [respondent was] not able to implement the skills that [she was] learning." Additionally, the court noted respondent was also required to engage in several other services related to her mental health. As to those services, the court stated

- 14 -

as follows:

> "Throughout the life of this case including during the specific \*\*\* nine[-]month periods, [respondent's] efforts as to these services have been sporadic at best and the—this failure to make meaningful efforts to engage in the services it was not reasonable, and there's little to no evidence that any progress had been made—had been made during these specific time frames."

¶ 36   Finally, the trial court also addressed the expert opinions of Dr. Phillips and Dr. Osgood, finding they were not "completely incompatible." However, regarding the issue of respondent's capacity to parent, the court accepted Dr. Phillips's opinion "that there were no combination of challenges \*\*\* that would render [respondent] incapable of parenting the children." Based on that opinion, the court determined there was no combination of issues, *i.e.*, intellectual deficiencies, substance abuse issues, mental health issues, "that would have prevented [respondent] from making reasonable efforts or reasonable progress related to the conditions that led [A.A., D.A., and K.G.] into care."

¶ 37   After finding respondent unfit, the trial court conducted the best-interest hearing. The State presented testimony from the minors' foster mother who stated the minors had been in her and her husband's care since being removed from respondent's home. Her testimony showed the minors were "happy and healthy" in the foster home and that they referred to their foster parents as "mom and dad." Additionally, the foster mother testified she loved the minors and wanted to adopt them. No further evidence was presented, and the trial court found termination of respondent's parental rights was in each minor's best interests.

¶ 38   On July 13, 2021, respondent filed a motion to reconsider the trial court's termination of her parental rights. She alleged her counsel provided ineffective assistance and the

court's decision was against the manifest weight of the evidence. In September 2021, the court denied the motion.

¶ 39    These appeals followed and were consolidated for purposes of review.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, respondent argues the trial court erred by terminating her parental rights. Specifically, she contends the court's fitness determination was against the manifest weight of the evidence due to "the efforts and progress she made in" the minors' cases and DCFS's lack of effort "in providing her [with] services for effective reunification." We disagree and affirm the court's judgment.

¶ 42    The involuntary termination of parental rights is a two-step process that requires a trial court to find (1) a parent unfit, by clear and convincing evidence, based upon grounds defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and (2) that termination is in the child's best interests. *In re M.I.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69. A court's finding of unfitness "will not be reversed on appeal unless that finding is against the manifest weight of the evidence." *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. An unfitness finding "is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *Id.*

¶ 43    As set forth above, the trial court found respondent unfit in A.A. and D.A.'s cases for failing to make (1) reasonable efforts to correct the conditions that were the basis for the minors' removal from her care and (2) reasonable progress toward the minors' return to her care during two consecutive nine-month time frames, extending from July 28, 2018, to April 28, 2019, and April 28, 2019, to January 28, 2020. Similarly, in K.G.'s case, it found respondent failed to make (1) reasonable efforts to correct the conditions that were the basis for K.G.'s removal from her care and (2) reasonable progress toward K.G.'s return to her care during the nine-month period

- 16 -

that extended from April 28, 2019, to January 28, 2020. We note " '[a] parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.' " *M.I.*, 2016 IL 120232, ¶ 43 (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005)). In this case, the evidence amply demonstrates respondent's failure to make reasonable progress during the alleged nine-month time frames. Accordingly, we confine our analysis to that statutory unfitness ground.

¶ 44        Under section 1(D)(m)(ii) of the Adoption Act, a finding of parental unfitness may be based on a parent's failure "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the [neglect] adjudication ***." 750 ILCS 50/1(D)(m)(ii) (West 2020). In determining whether reasonable progress has been made, courts should consider only evidence occurring within the relevant nine-month time period. *In re J.L.*, 236 Ill. 2d 329, 341, 924 N.E.2d 961, 968 (2010); see also *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 72, 144 N.E.3d 582 (stating evidence of the completion of services outside the nine-month time frame are irrelevant to an analysis of unfitness under section 1(D)(m)).

¶ 45        Further, this court has held that reasonable progress is an objective standard and that it exists when the trial court "can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In Interest of L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). "The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphasis in original.) *Id.* Additionally, our supreme court has stated as follows with respect to section 1(D)(m):

"[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001).

¶ 46    Here, evidence presented at the fitness hearing showed respondent was often slow to engage in recommended services and inconsistent in her participation with those services during the two relevant nine-month time frames, which, when taken consecutively, generally encompassed the time from A.A. and D.A.'s adjudication to shortly before the State initiated termination proceedings. During the first nine-month period—July 2018 to April 2019—respondent was unemployed, resided in a garage without running water for several months, was discharged from individual therapy for failing to attend, and failed to initiate psychiatric services. During the second nine-month period—April 2019 to January 2020—respondent failed to re-engage in individual therapy after a conflict arose with her therapist, stopped taking her recommended medication for a period of time, failed to attend psychiatric appointments and was "discharged," and failed to complete a six-week domestic violence course.

¶ 47    Additionally, although respondent consistently engaged in parenting services and attended visitations with her children, concerns persisted regarding her ability to appropriately parent. Respondent reportedly minimized or justified the reason her children were taken into care and failed "to display the knowledge that she learned" from parenting classes. Ruff, who supervised visits between respondent and her children, described several instances in 2019 when

- 18 -

she was required to intervene during visits.

¶ 48    In challenging the trial court's unfitness determinations on appeal, respondent has failed to confine her analysis of the issues to the relevant nine-month time periods. In setting forth what she accomplished "[d]uring the course of [the] case," she references activities and events occurring after January 2020. Although evidence presented at the fitness hearing indicates more consistent and greater engagement in services by respondent later in the case, those actions were not relevant to a determination of whether she failed to make reasonable progress during the specific time frames alleged. We find the trial court's determination that respondent failed to make reasonable progress toward the children's return to her care from July 28, 2018, to April 29, 2019, and April 28, 2019, to January 28, 2020, is supported by the record and not against the manifest weight of the evidence.

¶ 49    As stated, respondent also argues on appeal that DCFS's lack of effort "in providing her [with] services for effective reunification" warrants reversal of the trial court's unfitness determination. Specifically, she notes she completed a neuropsychological assessment in April 2019 that resulted in a recommendation that she "engage in occupational therapy or neuropsych rehabilitation." Respondent also cites to a service plan—dated November 7, 2019, and filed with the court on January 2, 2020—that notes respondent had not engaged in the recommended services and further stated as follows:

> "However, there has been difficulty in locating a service provider in this area that is able to do this service. [Respondent] has reached out to a neuropsychologist at Sarah Bush who is unable to meet this need. An available service provider will continue to be explored."

¶ 50    Respondent complains that, instead of pursuing reunification by "seeking a

neuropsychologist," DCFS elected to have her undergo a parenting capacity assessment with Dr. Osgood "to justify termination" of her parental rights. She argues that DCFS could have located Dr. Phillips, a neuropsychologist at Sarah Bush Lincoln Health Center, as her counsel was ultimately able to do. Further, respondent suggests that had DCFS timely pursued the neuropsychological services it recommended, her case would have had a different trajectory.

¶ 51    Initially, as noted by the State, respondent challenges DCFS's handling of her case and the appropriateness of her services for the first time on appeal. However, it is well settled that arguments not raised with the trial court are forfeited for purposes of review. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 93, 967 N.E.2d 968 (finding an argument forfeited on appeal because the party failed "to raise it before the trial court"); *Illinois Department of Healthcare & Family Services v. Warner*, 227 Ill. 2d 223, 233, 882 N.E.2d 557, 562 (2008) (finding an argument not previously raised was forfeited). Here, because respondent did not raise any objection to the services she received or present any argument regarding the appropriateness of those services with the trial court, the issue has been forfeited.

¶ 52    Further, even if we were to ignore respondent's forfeiture of the issue, we would find no merit to her claim. First, the record contains no evidence to support a finding that DCFS was disingenuous in its assertion that a service provider could not be located for "neuropsychological rehabilitation." Although respondent's counsel ultimately located Dr. Phillips, a clinical neuropsychologist, Dr. Phillips performed only a parenting capacity assessment of respondent. No testimony or evidence indicates he was available for rehabilitation services.

¶ 53    Second, the evidence presented at the fitness hearing does not reflect that DCFS mishandled respondent's case or that it failed to provide appropriate services. At the hearing, Dr. Phillips opined respondent had the capacity to parent safely and responsibly. Significantly, he also

stated his belief that the social and mental health services respondent received since 2018 had helped her. His testimony further indicated that the only additional services he envisioned for respondent included services similar to what she had already been receiving, *i.e.*, parenting education and supervision.

¶ 54 Third, there is nothing in the record to support a finding that the course of respondent's case would have been different if neuropsychological services had been pursued earlier and a service provider located. The record reflects that during the nine-month periods at issue, which comprised essentially the first 18 months after the neglect adjudication of A.A. and D.A., respondent was slow to engage in services. She also failed to consistently engage in mental-health related services. Based on the record presented, any suggestion that respondent would have fared better with neuropsychological services is pure speculation.

¶ 55 Finally, we note that in support of her contention that DCFS failed to provide appropriate services, respondent cites this court's decision in *In re I.W.*, 2018 IL App (4th) 170656, 115 N.E.3d 955. In that case, the respondent father's parental rights were terminated after he was found unfit based on the ground that he was unable to discharge his parental responsibilities due to intellectual and developmental disability. *Id.* ¶¶ 24, 28. On review, this court affirmed the trial court's judgment. *Id.* ¶ 57. However, the special concurrence in that case raised concerns regarding the way in which the unfitness finding was obtained, noting there was a clear understanding in the case that the respondent parents suffered from developmental or cognitive delays but there had not been reasonable accommodations in providing services to aid the parents. *Id.* ¶ 60 (DeArmond, J., specially concurring).

¶ 56 Ultimately, we find the circumstances of the present case are distinguishable from what occurred in *I.W.* Notably, here, respondent was not found unfit based upon an inability to

discharge parental responsibilities because of her intellectual or developmental disability. The trial court rejected that ground, relying in part on Dr. Phillips's opinion that respondent had "the capacity to parent safely and responsibly." Dr. Phillips stated that, although respondent had "some mental health disorder diagnoses," those disorders did "not summarily preclude her from being a safe and responsible parent." Again, his testimony also indicates the services that had been provided to respondent were appropriate and helpful to her. We find respondent has failed to show that the concern raised by the special concurrence in *I.W.*, regarding the lack of an opportunity for a parent's "meaningful participation" in services, is present in this case. *Id.* ¶ 113.

¶ 57        Here, the trial court's finding of unfitness was properly supported by the evidence, and an opposite conclusion is not clearly apparent. We note respondent does not challenge the court's best-interest finding on appeal. Accordingly, we find no error in the court's order terminating respondent's parental rights to her three children.

¶ 58                                III. CONCLUSION

¶ 59        For the reasons stated, we affirm the trial court's judgment.

¶ 60        Affirmed.